# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Power Paper, Ltd.,

                Plaintiff,

vs.

Pemstar, Inc.,

                Defendant.

**Civil No. 07-CV-2341 (MJD/SRN)**

**ANSWER AND COUNTERCLAIMS**

**(Trial by Jury Demanded)**

Defendant Pemstar, Inc. ("Defendant"), for its Answer to Complaint of Plaintiff Power Paper, Ltd. ("Plaintiff" or "Power Paper"), states and alleges as follows:

1.      Except as hereafter expressly admitted or otherwise stated, Pemstar denies each material allegation in the Complaint.

2.      Pemstar is without information sufficient to form a belief as to the truth of the matters alleged in paragraph 1.

3.      The following is provided in response to the allegations of paragraph 2:  In January 2007, the company formerly known as Pemstar, Inc. was renamed Benchmark Electronics Manufacturing, Inc. ("BEMI").  BEMI is, just like Pemstar was, a Minnesota corporation.  Because the allegations of the Complaint largely relate to periods before 2007, this Answer to avoid confusion refers to the Defendant as "Pemstar."

4.      Pemstar does not contest this Court's subject matter jurisdiction, as alleged in paragraph 3.

5.      Answering the allegations in paragraph 4, Pemstar admits that it resides in this judicial district, and does not contest venue in this Court as alleged in paragraph 4.  Pemstar denies the remaining allegations of paragraph 4.

6.      Answering the allegations in paragraph 5, Pemstar admits that Plaintiff and Pemstar were introduced by Newtechnologies, Ltd. in or about August 2003 but denies that Newtechnologies was Pemstar's agent at that time.  Upon information and belief, Newtechnologies had been engaged by Plaintiff and in that capacity approached Pemstar about designing and building an automated production line.   Pemstar is without information sufficient to form a belief as to the truth of the remaining allegations made in paragraph 5 and accordingly denies the same.

7.      Answering the allegations in paragraph 6, Pemstar admits that a meeting attended by representatives of Pemstar and Plaintiff took place in Europe in or about September 2003.  Representatives from Integrated Mechanization Solutions ("IMS"), a company that designs and builds high-precision automated production equipment, also attended the meeting.   The possibility of Plaintiff contracting with IMS to design and build an automated production line was discussed.  Plaintiff, however, desired to contract directly with Pemstar, understanding that IMS would act as a subcontractor and build the automation production line.  The terms of such an arrangement were thereafter negotiated by Pemstar and Plaintiff.  Pemstar denies any remaining allegations in paragraph 6.

8.      Answering the allegations in paragraph 7, Pemstar admits that the parties entered into a Production Line Design and Supply Agreement with an effective date of October 19, 2003 and that Exhibit 1 appears to be a copy of the Production Line Agreement. Pemstar asserts that the document speaks for itself and denies the allegations contained in

-2-

paragraph 7 to the extent they differ from or are inconsistent with the contents of the

Production Line Agreement.  Pemstar also admits that Pemstar and Plaintiff amended the

Production Line Agreement by agreement with an effective date of November 5, 2003, and

that Exhibit 2 appears to be a copy of the amendment.  Pemstar denies that Exhibit 3 to

Plaintiff's Complaint consists of an amendment to the Production Line Agreement dated

April 4, 2004, as the date of the document is April 30, 2004.  Pemstar affirmatively states

that the delivery of an automated production line under the Production Line Agreement (and

the amendments thereto) depended upon Plaintiff fulfilling its obligation to supply materials

of agreed specifications and quantities.  See, for example, Production Line Agreement, Ex.

A, § B-5.

9.     Answering the allegations in paragraph 8, Pemstar admits it believed that

Plaintiff had arranged for a company known as Toppan Forms, Ltd. to operate the

automation production line described in the Production Line Agreement and manufacture

product.  Pemstar states that the Production Line Agreement speaks for itself, and denies the

allegations contained in paragraph 9 to the extent they differ from or are inconsistent with the

contents of the Agreement.  Pemstar denies the remaining allegations of paragraph 8 as it

lacks knowledge as to the contents of the alleged Third Party Agreements and thus is without

sufficient information to form a belief as to the truth of Plaintiff's representations regarding

the same.

10.     Answering the allegations in paragraph 9, Pemstar states that Plaintiff did not

provide Pemstar with copies of the alleged Third Party Agreements.  Answering further,

Pemstar denies that it had knowledge of the obligations imposed on Plaintiff by the alleged

Third Party Agreements at the time the Production Line Agreement was executed.  Pemstar denies any remaining allegations in paragraph 9.

11.      Answering the allegations in paragraph 10, Pemstar admits that it engaged IMS as a subcontractor to provide design services and equipment for an automated production line to be built at IMS's facilities in the Netherlands and states affirmatively that this arrangement was understood and acknowledged by Plaintiff in § 2.1.6 of the Production Line Agreement.  Pemstar further admits that Plaintiff interacted directly with both Pemstar and IMS during the development of the production lines, and states affirmatively that Plaintiff was regularly on site during the equipment design and build phase, directing activities and seeking modifications to the specifications.  Pemstar further states that the delivery of automated equipment suitable for manufacturing was dependent upon Plaintiff meeting its contractual obligation to supply sufficient quantities of materials meeting agreed-upon specifications.  Pemstar is without information sufficient to form a belief as to the truth of the remaining allegations made in paragraph 10 and accordingly denies the same.

12.      Answering paragraph 11, Pemstar admits delays and technical problems occurred from time to time during the development of the production line.  Pemstar states affirmatively that such delays and problems resulted from Plaintiff's failure to timely provide to Pemstar sufficient quantities of materials that met the standards set forth in the Production Line Agreement.  For example, Plaintiff failed to supply batteries to specification.  Pemstar further states that during the development of the production line, Plaintiff acknowledged its failure to timely supply materials meeting the contract standards and, as a result, agreed to revise the timetables for building the production line.  Plaintiff continued to have problems supplying the requisite materials for production and therefore sought modifications to the

specifications for the production line that were intended to allow the production equipment to accept materials below the standards specified in the Production Line Agreement.  Pemstar denies the remaining allegations of paragraph 11.

13.     Answering paragraph 12, Pemstar generally understood that Plaintiff anticipated Toppan Forms would use the production lines to manufacture cosmetic patches but denies that Plaintiff informed Pemstar of any agreement it claims to have had with Estee Lauder in April 2004.  Pemstar also denies that it knew the alleged agreement between Plaintiff and Estee Lauder was at risk, as alleged in paragraph 12.  Rather, upon information and belief, Pemstar states that Plaintiff committed itself to delivering products to customers without first having in place the necessary arrangements and equipment for the actual manufacture of such products in large quantities.  Pemstar is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 12 and accordingly denies the same.

14.     Answering paragraph 13, Pemstar is without knowledge or information sufficient to form a belief as to the truth of the allegations regarding Estee Lauder's initial product order and accordingly denies the same.  Pemstar denies that in April 2004 Plaintiff told Pemstar of Estee Lauder's purchase requirements, launch dates or the impact of possible delays and in response received assurances as alleged in paragraph 13.  Pemstar states that it met its obligations under the Production Line Agreement, that it delivered operational production lines and that Power Paper accepted the equipment and paid Pemstar for the production lines.  Pemstar further states that thereafter Plaintiff contracted with Pemstar to provide additional equipment and services.

-5-

15.     Answering paragraph 14, Pemstar admits that in or about March 2005, Plaintiff was informed that Pemstar was conducting a production capacity analysis of a production line for battery-operated cosmetic patches.  Pemstar states that Plaintiff's failure to supply materials in the quantity and meeting the specifications set forth in the Production Line Agreement limited the amount of patches the line could produce.  Pemstar is without knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's obligations to Estee Lauder.  Pemstar denies that, knowing of Plaintiff's obligations to Estee Lauder, it offered to install the production lines at its Ireland facilities, as alleged in paragraph 14.  Rather, Pemstar states that in or about April 2005 it learned Toppan Forms refused to go forward as the manufacturer for Plaintiff due in large part, upon information and belief, to uncertainties in the materials supplied by Plaintiff.   Plaintiff said it needed to find a manufacturer to operate the production line and asked Pemstar to step in and produce the cosmetic patches for delivery to Estee Lauder.  In response to Plaintiff's request, Pemstar ultimately agreed to install and operate the production line at its Ireland facilities. Prior to that time, it was not contemplated that Pemstar would manufacture product for Plaintiff for delivery to customers.  Pemstar admits that in or about May 2005 the production line, after being accepted by Plaintiff, was transferred to Pemstar's facilities in Ireland. Pemstar states that in July 2005 it made the first shipment of product to Estee Lauder and was commended by both Plaintiff and Estee Lauder for its efforts.  Plaintiff denies the remaining allegations of paragraph 14.

16.     Answering paragraph 15, Pemstar is without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations regarding the existence of a contract with Christian Dior or its motivation for entering into the alleged contract.  Pemstar

denies being informed by Plaintiff in or about June 2005 about any contractual arrangements it may have had with Dior.  Rather, Pemstar states affirmatively that during this time frame Plaintiff asked Pemstar to host Dior representatives for a  tour of the Ireland facility. Plaintiff said it wanted Pemstar to create the impression for Dior representatives that the Ireland facility was manufacturing products in large quantities, when Plaintiff knew the facility was not yet in production (as Pemstar was still in the process of building a clean room and installing the equipment).  Pemstar further states that Plaintiff knew the production line installed at the Ireland facility was designed and calibrated to manufacture products meeting the specifications of Estee Lauder and could not accommodate other products, such as Dior products, without modification.  Pemstar denies the remaining allegations of paragraph 15.

17.     Answering the allegations in paragraph 16, Pemstar is without knowledge or information sufficient to form a belief as to the truth of the assertions regarding product orders Dior allegedly may have placed with Plaintiff in or about June 2005 and accordingly denies the same.  Pemstar denies that Plaintiff told Pemstar of Dior's purchase requirements, launch dates or the impact of possible delays and denies that in response assurances were provided as alleged in paragraph 16.  Pemstar states affirmatively that Plaintiff knew prior to June 2005 that the production line installed at Pemstar's Ireland facility (which Plaintiff had approved and accepted) would need to be modified to produce a cosmetic patch for Dior, as that patch required the inclusion of certain non-woven materials that the production line Plaintiff had originally specified could not accommodate.  Pemstar admits that it informed Plaintiff that it would meet its obligations under the Production Line Agreement and states that it did so, but denies the implication that the production line could without modification

produce Dior's cosmetic patch.  Further, Pemstar affirmatively states that in or about

February 2006 Plaintiff asked Pemstar to design the modifications necessary to produce the

Dior cosmetic patch.  Pemstar denies any remaining allegations of paragraph 16.

18.     Answering the allegations in paragraph 17, Pemstar states that in or about June

2005 Plaintiff asked Pemstar to design, implement and certify modifications to the

production line for additional products.  Pemstar admits that Plaintiff and Pemstar executed a

Manufacturing Contract dated June 23, 2005, and a copy of that agreement appears to be

attached as Exhibit 4.  Pemstar states that the Manufacturing Contract speaks for itself, and

denies the allegations in paragraph 17 to the extent they differ from or are inconsistent with

the Manufacturing Contract.  Pemstar denies that it failed to deliver the specified quantities

of patches in the timeframe originally specified in the Manufacturing Contract, and states

affirmatively that to the extent, if any, patches were not produced within the timeframes

originally specified, this was a result of Plaintiff's failure to properly disclose to Pemstar

certain customer requirements, and Plaintiff's failure to provide materials to Pemstar that met

contractually defined specifications.

19.     Answering the allegations in paragraph 18, Pemstar admits that Pemstar and

Plaintiff amended the Manufacturing Contract in writing on February 1, 2006, and May 18,

2006, and that copies of those agreements appear to be attached as Exhibits 5 and 6.

Answering further, Pemstar states that the amendments speak for themselves.  Pemstar

denies the allegations of paragraph 18 to the extent they differ from or are inconsistent with

the terms of the written amendments.  Pemstar denies that it failed to comply with its

obligations under the May 18, 2006, Amendment, as alleged in paragraph 18, and

affirmatively states that it met its obligations under the Manufacturing Contract and under

both amendments thereto.  Pemstar further states that it later learned from Dior representatives that Plaintiff had contracted to supply cosmetic patches to Dior in large quantities before Plaintiff had contracted with Pemstar to design and implement the necessary modifications to the production line to accommodate such a production.  Pemstar denies any remaining allegations of paragraph 18.

20.     Answering the allegations in paragraph 19, Pemstar is without knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations regarding alleged changes to the initial orders placed by Estee Lauder and accordingly denies the same. Pemstar denies that it caused any protracted delays and denies that it was unable to deliver a fully operational production line, as alleged in paragraph 19.  In fact, Pemstar delivered fully operational production lines to Plaintiff, which Plaintiff approved, accepted and paid for in accordance with the Production Line Agreement.  After Plaintiff's original manufacturer declined to produce patches for Plaintiff, Pemstar installed the production line in its own facility, delivered more than 4 million units of cosmetic patches to Estee Lauder within roughly an 8-month period, and filled each purchase order that Plaintiff submitted to it for the manufacture of products using the automated production lines.

## COUNT I
### Breach of Contract – The Production Line Agreement

21.     Pemstar incorporates by reference the statements contained in Paragraphs 1 through 20 above as if fully set forth herein.

22.     Answering the allegations in paragraph 21, Pemstar states that those allegations set forth a legal conclusion, to which no response is required.  To the extent an

answer is required, Pemstar does not contest the validity or enforceability of the Production

Line Agreement or the amendments thereto.

23.     Answering the allegations in paragraph 22, Pemstar denies that Plaintiff fully

performed its obligations under the Production Line Agreement.

24.     Answering the allegations in paragraph 23, Pemstar denies that it breached its

obligations under the Production Line Agreement, and states affirmatively that it delivered to

Plaintiff fully operational production lines that Plaintiff accepted and acknowledged met the

contractual specifications.

25.     Answering the allegations in paragraph 24, Pemstar denies that Pemstar has

caused Plaintiff any damage, and denies that Plaintiff has suffered any damages as alleged in

that paragraph.

**COUNT II**
**Breach of Contract – The Manufacturing Contract**

26.     Pemstar incorporates by reference the statements contained in Paragraphs 1

through 25 above as if fully set forth herein.

27.     Answering the allegations in paragraph 26, Pemstar states that those

allegations set forth a legal conclusion, to which no response is required.  To the extent an

answer is required, Pemstar does not contest the validity or enforceability of the

Manufacturing Contract or the amendments thereto.

28.     Answering the allegations in paragraph 27, Pemstar denies that Plaintiff fully

performed its obligations under the Manufacturing Contract.

29.     Answering the allegations in paragraph 28, Pemstar denies that it breached its

obligations under the Manufacturing Contract, and states affirmatively that it manufactured

-10-

all cosmetic patches that Plaintiff submitted purchase orders for.  Pemstar completed

production of the approximately 4 million units of cosmetic patches for Estee Lauder by July

2006.  Yet, Plaintiff thereafter submitted no further orders, even though Pemstar had

production capability and Plaintiff had committed to placing orders with Pemstar for 20

million units.

30.     Answering the allegations in paragraph 29, Pemstar denies that Pemstar has

caused Plaintiff any damage, and denies that Plaintiff has suffered the damage alleged in that

paragraph.  Pemstar further states that the damages Plaintiff purports to seek are foreclosed

by the limitation of damages provision contained in the Manufacturing Contract.

## AFFIRMATIVE DEFENSES

31.     Plaintiff's Complaint fails, in whole or in part, to state a claim upon which

relief may be granted.

32.     Plaintiff's Complaint fails, in whole or in part, based on the doctrines of

waiver, estoppel, and unclean hands.

33.     Plaintiff's Complaint fails, in whole or in part, based in its failure to mitigate

its damages.

34.     Plaintiff's Complaint fails, in whole or in part, based on based on its

contractual acceptance of the goods from Pemstar.

35.     Plaintiff's Complaint fails, in whole or in part, based on Plaintiff's

contributory negligence or other fault in causing its purported damages.

36.     Plaintiff's Complaint fails, in whole or in part, based on the contractual

limitation of damages set out in the parties' agreements.

## COUNTERCLAIMS

Pemstar, for its Counterclaims against Plaintiff Power Paper, Ltd., states and avers as follows:

1.      These Counterclaims stem from Power Paper's failure to pay amounts indisputably due to Pemstar.  Specifically, Power Paper has failed to pay for engineering upgrades that Power Paper requested of Pemstar, that Pemstar timely completed, and that Power Paper accepted.  In addition, Power Paper has failed to pay for cosmetic patch products that Pemstar completed and shipped to Power Paper in accordance with applicable purchase orders.

2.      In addition, these Counterclaims stem from Power Paper's failure to place purchase orders as contractually required or, in the alternative, to compensate Pemstar at the same rate as if such purchase orders had been placed, as called for under the parties' contract.

## JURISDICTION AND VENUE

3.      Jurisdiction over these Counterclaims is proper under 28 U.S.C. § 1332(a) because they involve citizens of a State and a foreign state and the total amount in controversy, exclusive of costs and interest, exceeds $75,000.  In addition, jurisdiction over these Counterclaims is proper under 28 U.S.C. § 1367(a).

4.      Venue in this Court is proper under 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

5.      Pursuant to the Production Line Design and Supply Agreement dated October 19, 2003, and all applicable amendments thereto, Pemstar delivered to Power Paper – and Power Paper acknowledged the quality of, accepted, and paid for – a fully operational automated production line.

-12-

6.      At Power Paper's direction, this original automated production line was built to specifications that met the requirements of a particular cosmetic patch that Power Paper sought to have produced for a customer, whose identity later became known to Pemstar to be Estee Lauder.

7.      Thereafter, on several occasions in 2006, Power Paper requested that Pemstar design and implement modifications to the original automated production line.  At Plaintiff's request, Pemstar made a proposal dated July 7, 2006, for upgrading the original automated production line.  Power Paper accepted the proposal on or about July 18, 2006.  Pursuant to the July 2006 agreement, Pemstar was to make certain specified upgrades to the original automated production line and be paid by Plaintiff for such work.

8.      In keeping with the July 2006 agreement, Pemstar followed the specifications indicated by Power Paper, and produced an upgraded automated production line within the agreed-upon time frame.

9.      Power Paper indicated its agreement that the upgraded production line met its qualifications, and it accepted the upgraded production line.

10.     After accepting the upgraded production line, Power Paper began to make payments to Pemstar for the work Pemstar performed.

11.     Despite Power Paper's acceptance of the upgraded production line, and despite beginning payment for the work, Power Paper has not released the final two payments due to Pemstar.  These final two payments were for €172,500 and €103,000, for a total of €275,500. In addition, Pemstar sent additional invoices for other costs associated with the upgraded production line that Power Paper has not paid.  The total principal amount due on the upgraded production line is €308,000.

-13-

12.     In addition, Power Paper submitted to Pemstar purchase orders for cosmetic patches for Christian Dior.  Pemstar fulfilled each of these purchase orders, and shipped products to Power Paper in February and March, 2007.

13.     Despite accepting shipment of the Christian Dior patches, Power Paper has not paid Pemstar all amounts due for these products.

14.     Specifically, Power Paper has $240,000 in unpaid invoices, based upon Pemstar's production and shipment of the Christian Dior patches.

15.     Finally, under the Second Amendment to Manufacturing Contract between Power Paper and Pemstar, dated May 18, 2006, Pemstar agreed it would design, build and operate at its own expense the Flexi-Line production line, to be used to produce cosmetic patches for Christian Dior.

16.     In exchange, Power Paper agreed in the Second Amendment to Manufacturing Contract that it would submit to Pemstar certain minimum aggregate Product orders within certain time frames.  Specifically, Power Paper agreed it would submit a minimum order of 5 million packets between October 1, 2006, and September 30, 2007, a minimum order of 5 million packets between October 1, 2007, and September 30, 2008, a minimum order of 5 million packets between October 1, 2008, and September 30, 2009, and a minimum order of 5 million packets between October 1, 2009, and September 30, 2010.  In other words, Power Paper agreed to place an aggregate minimum order of 20 million packets over a four-year period.

17.     Power Paper further agreed that in the event it did not met these minimum orders, Power Paper "shall pay to Pemstar an amount equal to $0.05 per packet for any

balance of the above quantities that have not been ordered during a particular 12 month period.

18.     To date, Power Paper has ordered (and Pemstar has shipped) only 550,000 packets under the Second Amendment to Manufacturing Contract.

19.     Power Paper is thus contractually obligated to order an additional 19,450,000 packets, or to pay Pemstar $0.05 for any balance that Power Paper does not order.  This payment on 19,450,000 packets equals $972,500.

20.     Power Paper's complaint in this matter alleges that Christian Dior has canceled its orders with Power Paper.  It thus appears that Power Paper will not be submitting any further orders as required under the Second Amendment to Manufacturing Contract.

21.     Accordingly, Power Paper owes Pemstar the $0.05 contractually agreed-upon figure for each of the 19,450,000 packets that Power Paper failed to order as part of its minimum obligation to Pemstar.

## COUNT I
### Breach of Contract – Upgraded Automated Production Line

22.     Pemstar incorporates by reference its answers to Power Paper's Complaint set forth above, as well as the allegations set out in paragraphs 1 through 22 of its Counterclaims.

23.     Pemstar's and Power Paper's agreement whereby Pemstar undertook to upgrade the original automated production line is a valid and legally enforceable contract.

24.     Pemstar fully performed its obligations under the agreement, producing for Power Paper an upgraded automated production line that was timely delivered, met the agreed-upon specifications, and was accepted by Power Paper.

25.     Power Paper has breached its obligations under this agreement by failing to release the final two payments due for the updated automated production line.

26.     Pemstar has been damaged in the principal amount of €275,500.  Further additional charges were also invoiced concerning the build of the upgraded automated production line, for which Power Paper has not paid.  Pemstar's total damages are €308,000.

**COUNT II**
**Breach of Contract – Christian Dior Purchase Orders**

27.     Pemstar incorporates by reference its answers to Power Paper's Complaint set forth above, as well as the allegations set out in paragraphs 1 through 27 of its Counterclaims.

28.     The purchase orders between Power Paper and Pemstar relating to the Christian Dior cosmetic patches are valid and legally enforceable contracts.

29.     Pemstar fully performed its obligations under these purchase orders, producing Christian Dior cosmetic patches for Power Paper that were timely delivered and accepted by Power Paper.

30.     Power Paper has breached its obligations under the purchase orders by failing to pay all outstanding invoices on Christian Dior cosmetic patches.

31.     Pemstar has been damaged in the principal amount of $240,000.

## COUNT III
### Breach of Contract – Second Amendment to Manufacturing Contract

32.     Pemstar incorporates by reference its answers to Power Paper's Complaint set forth above, as well as the allegations set out in paragraphs 1 through 32 of its Counterclaims.

33.     The Second Amendment to Manufacturing Contract between Pemstar and Power Paper is a valid and legally enforceable contract.

34.     Pemstar fully performed its obligations under the Second Amendment to Manufacturing Contract, timely designing and building the Flexi-Line.

35.     Power Paper has breached – whether actually or anticipatorily – its obligations under the Second Amendment to Manufacturing Contract, as it has failed to order from Pemstar the minimum aggregate number of products to be manufactured on the Flexi-Line, has indicated it has no further orders from Christian Dior for cosmetic patches (which Christian Dior patches were the product being manufactured using the Flexi-Line), and has failed to pay Pemstar $0.05 for each of the 19,450,000 packets that Power Paper remains obligated to order as part of its aggregate minimum obligation.

36.     Pemstar has been damaged in the principal amount of $972,500.

### JURY DEMAND

37.     Pemstar hereby demands a jury for all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Pemstar prays for the following relief:

A.     That this Court dismiss Power Paper's complaint in its entirety with prejudice and on the merits;

B.     That the Court adjudge and decree that Power Paper has breached its contractual obligations to Pemstar as alleged in these Counterclaims;

C.     That Pemstar recover from Power Paper as damages an amount in excess of $75,000;

D.     That Pemstar recover from Power Paper the costs of this suit and, to the extent available, its reasonable attorneys' fees; and

E.     That Pemstar have such other, further and equitable relief as the Court may deem just and proper.


Dated:  August 3, 2007                          **FAEGRE & BENSON LLP**


                                                 s/Deborah A. Ellingboe
                                                Julie Knox Chosy (#225228)
                                                Deborah A. Ellingboe (#26216X)
                                                2200 Wells Fargo Center
                                                90 South Seventh Street
                                                Minneapolis, Minnesota 55402-3901
                                                Telephone:      (612) 766-7000
                                                Facsimile:      (612) 766-1600

                                                **ATTORNEYS FOR DEFENDANT**

fb.us.2215601.02